UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOSEPH C. BOOKER,

    Plaintiff,

v.

WEXFORD HEALTH SOURCES, INC.,
GHALIAH OBAISI, Independent
Executor of the Estate of SALEH
OBAISI, M.D., DR. ALMA MARTIJA, M.D.,
and LA TANYA WILLIAMS, P.A.,

    Defendants.

No. 16 CV 10440

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

Plaintiff Joseph Booker, an inmate with the Illinois Department of Corrections, brings claims under 42 U.S.C. § 1983 for deliberate indifference to his medical needs against two doctors and one physician's assistant who treated Booker for severe shoulder pain. Booker also sues Wexford Health, alleging its policies caused his constitutional injury. Defendants move for summary judgment. For the reasons discussed below, their motion is granted.

## I. Legal Standards

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking

summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## II.   Background

Defendant Wexford Health Sources, Inc. had a contract to provide medical services to inmates in the custody of the Illinois Department of Corrections. [61] ¶ 2.[1] It employed individual defendants La Tanya Williams (a physician's assistant), Dr. Alma Martija (a staff physician), and Dr. Saleh Obaisi (the Medical Director) at Stateville Correctional Center. *Id.* ¶¶ 3–5.[2] Wexford promulgated policies and procedures that set forth guidelines and treatment algorithms for its medical professionals. [75] ¶ 70. Wexford's guidelines recommended that medical practitioners maintain a "healthy amount of doubtful suspicion" about a patient's complaints, *see* [73] at 11, but also cautioned that "[c]linical pathways do not replace sound clinical judgment, nor are they intended to strictly apply to all patients" and instructed practitioners to account for the individual circumstances of each patient. *See* [75] ¶ 70.

Sometime around September 2013, when plaintiff Joseph Booker was incarcerated in a different facility, he suffered shoulder and knee injuries when

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. The facts are largely taken from defendants' Local Rule 56.1 statements, [61], and defendants' responses to plaintiff's Local Rule 56.1 statements, [75].

[2] Ghaliah Obaisi, Independent Executor of Dr. Saleh Obaisi's estate, was substituted as a party in this action upon Dr. Saleh Obaisi's death. *See* Fed. R. Civ. P. 25(a)(1).

correctional officers dragged him out of his cell. [61] ¶¶ 9, 10; [72] ¶¶ 9, 10.[3] After the incident, Booker was admitted to the infirmary. [61] ¶ 10. Two days later, Booker had a follow-up evaluation, where the physician noted superficial skin abrasions and diagnosed him with somatization, which is "[t]he process by which psychological needs are expressed in physical symptoms; e.g., the expression or conversion into physical symptoms of anxiety, or a wish for material gain associated with a legal action following an injury, or a related psychological need." [61] ¶ 11; *Somatization*, Steidman's Medical Dictionary 1788 (28th ed. 2006).[4] The doctor prescribed Motrin and referred him to the psychiatric department. [61] ¶ 11. In late October, Booker saw a nurse practitioner and complained of cracking in his left shoulder, swelling in his left knee, and pain in his lower back and wrists. *Id*. ¶ 12. After examining him, the nurse practitioner noted Booker had normal range of motion in his shoulders, wrists, and knees; advised him against going to the yard; prescribed him Motrin and analgesic balm; and gave him instructions for stretches to increase his range of motion. *Id*.

---

[3] Booker frequently asserts additional facts in his responses to defendants' LR 56.1 statements. *See* [72]. This violates Local Rule 56.1. But because a number of these assertions are crucial to Booker's arguments, I consider those assertions that are supported by citations to the record and cite to them accordingly. Any arguments raised in the Local Rule 56.1 statements and statements that are unsupported by admissible evidence (or where a party fails to follow Local Rule 56.1's direction to cite to supporting material in the record) will be disregarded. Only facts that are properly controverted will be considered disputed.

[4] Courts may properly take judicial notice of information from reputable medical sources, especially when needed only to determine whether there is a factual dispute at the summary-judgment stage. *See Rowe v. Gibson*, 798 F.3d 622, 628–29 (7th Cir. 2015).

A few months later, Booker was transferred to Stateville, where he remained for a few years. *Id.* ¶ 1. Booker first received medical care at Stateville two months after he arrived, when he complained he was having "stabbing and constant" shoulder pain, which he rated as an 8 or 9 on a scale of 10. *Id.* ¶ 14; [72] ¶ 14. The nurse ordered X-rays, prescribed him Motrin, and advised him to refrain from physical activity. [61] ¶ 14. A week later, Booker had an X-ray taken of his left knee, shoulder, and spine. *Id.* ¶ 15. The results came back negative. *Id.* Later, Booker returned for another visit to the nurse sick call and reported he was still experiencing pain in his left knee and shoulder and his lower back. *Id.* ¶ 16. The nurse prescribed him Tylenol, gave him a supportive knee sleeve, advised him to use hot and cold packs and avoid strenuous activity, and referred him to the physician's sick call. *Id.* A few weeks after that, a physician's assistant prescribed Mobic, an NSAID, and Robaxin, a muscle relaxer. *Id.* ¶ 18. Booker complained that his pain had gotten worse and requested an MRI, which the physician's assistant included in his notes, along with a referral to Dr. Obaisi to evaluate Booker's longstanding shoulder pain. [72] ¶ 18.

Booker first saw Dr. Obaisi on April 1, 2014. [61] ¶ 19. At that visit, Dr. Obaisi noted "movements [left] shoulder full range . . . normal left knee and back." *Id.* He diagnosed Booker with "pain-joints," renewed his Mobic prescription, and told Booker to follow up in a month. *Id.* Dr. Obaisi did not reference the physician assistant's note about a possible MRI. [72] ¶ 19. At some point around this time, Dr. Obaisi gave Booker a steroid injection for the pain in his shoulder. [61] ¶ 20. He also gave Booker a medical permit advising correctional staff that he should be restrained with a waist

4

chain only. *Id.*[5] Dr. Obaisi gave Booker a second injection on August 29, 2014, noting that Booker had reported the "steroid injection helped with shoulder pain for 2 months . . . requesting second injection." *Id.* ¶ 22. After that injection, Booker did not see any of the individual defendants until early the next year, when he had an initial evaluation with Williams where he complained about an unrelated rash. *Id.* ¶¶ 23, 24. In March 2015, Booker visited a nurse, again complaining of his shoulder pain. *Id.* ¶ 25. The nurse noted that Booker was exhibiting crepitus (a crackling, or the noise or vibration produced by rubbing bone or cartilage together, *see Crepitus*, Steidman's Medical Dictionary 457 (28th ed. 2006)) and scheduled Booker for the physician's sick call. *Id.* ¶ 25; [72] ¶ 25. Booker had another appointment with Williams a few weeks later, and he reported his rash was better, but that he was still having shoulder pain and the most-recent steroid injection had not helped. [61] ¶ 26; [72] ¶ 26. Williams diagnosed Booker with chronic shoulder pain and referred him back to Dr. Obaisi. *Id.*

Dr. Obaisi evaluated Booker again in April 2015. [61] ¶ 27. In addition to continued shoulder pain, Booker reported his knee pain had come back. *Id.* After a physical evaluation did not return any findings, Dr. Obaisi ordered an X-ray of Booker's left shoulder and knee, referred him to physical therapy, and renewed his Mobic prescription. *Id.* Dr. Obaisi again did not acknowledge the physician assistant's note about a possible an MRI. [72] ¶ 27. About two weeks later, Booker underwent X-

---

[5] Booker admits that Dr. Obaisi gave him a medical permit but notes that the correctional officers did not honor that permit. [72] ¶ 20.

5

rays of his left shoulder and knee. [61] ¶ 28. Dr. Obaisi reviewed the results three days later, and they were negative. *Id.*

Booker attended a physical therapy evaluation in June 2015. *Id.* ¶ 29. The physical therapist noted tenderness with palpation and diminished range of motion, and signs of impingement in Booker's left shoulder, though he found "no significant functional deficit." *Id.*; [72] ¶ 29. The therapist was uncertain as to the origin of Booker's left knee complaint, and he suspected symptom magnification. *Id.* He recommended Booker follow a home-exercise plan and do three to four weeks of physical therapy. *Id.* Booker attended four physical therapy sessions from June through August. [61] ¶ 30. He did not participate in some of his scheduled sessions because he had visitors, and he also had trouble completing the sessions and his exercises because of his continued pain. *Id.*; [72] ¶ 30. After his final session, the therapist discharged Booker from physical therapy, advised him to keep up with his home-exercise plan, and referred him back to Dr. Obaisi. *Id.* The physical therapist again noted that Booker's complaints were "highly subjective" and the result of "possible symptom magnification." *Id.*

Booker saw Dr. Obaisi again about a month later. [61] ¶ 31. Booker again complained about his shoulder and knee pain, noting he was experiencing a grinding sensation in his left shoulder. [72] ¶ 31. Dr. Obaisi told Booker grinding in a joint was not a disease, prescribed him Voltaren (an NSAID), and recommended additional physical therapy, which Booker refused. *Id.*; [61] ¶ 31. In September 2015, Booker

filed a grievance requesting that Dr. Obaisi order an MRI and an outside referral to evaluate Booker's left shoulder. [75] ¶ 72.[6]

Dr. Martija saw Booker for the first and only time in December 2015. [61] ¶ 32. She noted that Booker refused to participate in physical therapy because his medication did not adequately alleviate his pain, but that Booker was able to climb into his upper bunk and to bench press despite his reported pain (though Booker claims he told Dr. Martija that his shoulder pain interfered with many of his daily activities). *Id.*; [72] ¶ 32. After a physical examination, Dr. Martija diagnosed Booker with "left shoulder and left knee pain with no demonstrable pathology or handicap." [61] ¶ 32. Though she concluded Voltaren should manage Booker's pain, she prescribed 600mg Motrin because Booker preferred it. *Id.* Booker filed another grievance for being forced to wait four hours for his appointment. [75] ¶ 73. In it, Booker also reported that Dr. Martija had informed him that an MRI was "not going to happen" and that Dr. Obaisi would not send Booker for an MRI because Booker had filed a grievance against him. *Id.*[7]

On March 3, 2016, Booker had an appointment with Williams where he reported that his pain was getting worse despite the medicine he was taking, the steroid injections, and physical therapy. [61] ¶ 33; [72] ¶ 33. Williams prescribed

---

[6] Defendants respond saying they lack enough information to admit or deny this assertion. Because Booker's assertion is supported by a citation to the record, and because assertions not controverted are deemed admitted, I treat this assertion as true.

[7] Dr. Martija disputes the truth of this statement, citing her notes from that appointment, which do not indicate that she said anything similar. But viewing the facts in the light most favorable to Booker, I credit his account of the conversation.

7

Robaxin and Motrin and referred Booker back to Dr. Obaisi for further evaluation. [61] ¶ 33. A week later, Booker attended a second physical therapy evaluation with the same therapist, who noted Booker was "unable to tolerate even light exercise despite minimal objective findings." [61] ¶ 34. The therapist again suspected symptom magnification, noting that Booker had a lawsuit pending. *Id*. After determining that continued therapy was unlikely to help, the therapist advised Booker to keep up with his home-exercise plan but discharged him and referred him back to Dr. Obaisi. *Id*. At his next appointment with Dr. Obaisi, Booker requested an MRI. [72] ¶ 35. Instead, Dr. Obaisi performed a third steroid injection, renewed Booker's Voltaren prescription, and told him to come back for a follow-up in two months. [61] ¶ 35.

Williams evaluated Booker a few months later. [61] ¶ 36. Williams complied with Booker's request to switch from his current medicine, which he felt was affecting his vision, to Motrin and Robaxin. *Id*. At an appointment with Dr. Obaisi, Booker refused to lift his arm because of his severe pain and reduced range of motion and again requested an MRI. [72] ¶ 37. Dr. Obaisi referred Booker for an MRI of his left shoulder on June 7, 2016; and the request was approved a week later. [61] ¶ 38. Booker got an MRI on July 5, and it revealed a "large Hills-Sachs deformity in the superior lateral part of the humeral head." *Id*. ¶ 39; [72-4] at 44. A Hills-Sachs lesion is compression fracture of the humeral head, which can occur when someone dislocates his shoulder. *See Lesion, Hills-Sachs*, Dorland's Illustrated Medical Dictionary 1025 (32d ed. 2012).

Booker had an appointment with another physician at Stateville to discuss the results of his MRI. [61] ¶ 41. That physician then referred Booker to Dr. Obaisi for further evaluation and treatment. *Id*. After reviewing the MRI results, Dr. Obaisi referred Booker for an orthopedic evaluation of his left shoulder. *Id*. ¶ 42. Wexford's utilization management department approved the service request the next day. *Id*. Booker attended a follow-up visit with Dr. Obaisi, and Dr. Obaisi told Booker he had referred him for a consultation with an orthopedic specialist. *Id*. ¶ 43. In September 2016, Booker went to a nurse sick call appointment and complained about his continued shoulder pain. *Id*. ¶ 44. The nurse renewed Booker's Motrin prescription for three months. *Id*. Booker saw Williams about two weeks later, and again complained about his shoulder pain as well as some unrelated neck pain. *Id*. ¶ 45. Williams prescribed Naprosyn (a NSAID), ordered an X-ray of Booker's cervical spine, and directed him to come back in one month. *Id*. At his follow-up evaluation, Williams discussed the results of the X-ray with Booker, gave him a medical permit to receive ice, and referred him to Dr. Obaisi for further evaluation. *Id*. ¶ 46. When Booker saw Dr. Obaisi a few days later, Dr. Obaisi reminded him he had a pending consultation, renewed his prescriptions, and gave him a three-month ice permit. *Id*. ¶ 47.

Booker attended his initial orthopedic evaluation with Dr. Neena Szuch in November 2016. *Id*. ¶ 48. Dr. Szuch ordered an X-ray of Booker's left shoulder, which came back normal. *Id*. After performing a physical exam and reviewing the MRI report and X-ray, Dr. Szuch concluded that Booker had an acute dislocation with spontaneous reduction of his left shoulder. *Id*. She did not recommend surgery or

9

stronger pain medication; she recommended Booker undergo physical therapy to increase his range of motion. *Id*. After that evaluation, Dr. Obaisi prescribed Booker Tramadol (a narcotic-strength medication), Naprosyn, and Tylenol. *Id*. ¶ 49. On Dr. Szuch's recommendation, he also referred Booker for a third course of physical therapy. *Id*. At his physical therapy evaluation later that day, the same therapist Booker had seen before recommended one or two sessions per week for ten to twelve weeks, coupled with a home-exercise plan, to focus on Booker's range of motion, strengthening, and stability. *Id*. ¶ 50. Booker regularly attended physical therapy for two and a half months, and during that time his range of motion increased, and his pain decreased. *Id*. ¶ 51.

At a follow-up appointment in early 2017, Dr. Obaisi doubled the dosage of Booker's Tramadol prescription from 50mg to 100mg. *Id*. ¶ 52. Later, the therapist discharged Booker from physical therapy. *Id*. ¶ 53. Booker saw Dr. Obaisi for another evaluation. *Id*. ¶ 54. Based on Booker's continued shoulder pain, Dr. Obaisi referred him to a second orthopedic evaluation with Dr. Szuch, and that referral was approved. *Id*. At the consultation, Dr. Szuch noted that Booker's "range of motion appears to have improved significantly with physical therapy." *Id*. ¶ 55. She recommended an MR arthrogram of Booker's left shoulder to see if surgical intervention was possible and instructed Booker to continue his exercise plan. *Id*. Dr. Szuch did not recommend any pain medication. *Id*.

Dr. Obaisi provided Booker with a medical permit for a low bunk for the next two weeks (though Dr. Obaisi did not have the ability to ensure correctional officers

honored that permit. *Id.* ¶ 67). *Id.* ¶ 56. Booker saw Dr. Obaisi again to discuss Dr. Szuch's recommendation for an MR arthrogram. *Id.* ¶ 57. Dr. Obaisi also renewed Booker's Tramadol prescription for another sixty days. *Id.* A week later, Dr. Obaisi and another doctor approved the MR arthrogram and follow-up evaluation with Dr. Szuch. *Id.* ¶ 58. The MR arthrogram showed no significant changes since Booker's 2016 MRI. *Id.* ¶ 59. Booker had his third and final orthopedic evaluation, and Dr. Szuch noted, "patient is reassured that there does not appear to be any ongoing instability. Do not see any indication for repair of labrum. I have concerns that it is unlikely that any surgical procedure is likely to give him a pain-free shoulder." *Id.* ¶ 60. Dr. Szuch administered a steroid injection and discharged Booker from her care, noting "no further treatment anticipated." *Id.*

About a week later, Booker discussed Dr. Szuch's recommendation with Dr. Obaisi and Booker requested a referral for a second opinion. *Id.* ¶ 61; [72] ¶ 61. Over the next several months, Booker attended two evaluations with both Dr. Obaisi and Williams to renew his pain medication prescriptions. [61] ¶ 62. During her treatment of Booker, Williams never formed the impression that additional medical intervention was necessary. *Id.* ¶ 69. In reaching that conclusion, Williams did not rely on Wexford's written medical guidelines. *Id.* ¶ 68. Williams never relied on Wexford's written guidelines when treating any patient; she relied on her clinical knowledge and experience. *Id.* ¶¶ 68–69.

**III. Analysis**

"[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)) (citation omitted). To prevail on a deliberate-indifference claim, a plaintiff must establish that he suffered from "an objectively serious medical condition" and that the defendants were "deliberately indifferent to that condition"—a subjective inquiry. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). Booker sues Dr. Obaisi's estate, Dr. Martija, and Williams asserting that each was deliberately indifferent to his shoulder injury, as well as Wexford, arguing that its policies caused the individual defendants' deliberate indifference.

A medical need is sufficiently serious if a physician has diagnosed the inmate's condition as mandating treatment, *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011), or if failure to treat the condition "could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *Gutierrez v. Peters*, 111 F.3d 1364, 1372 (7th Cir. 1997) (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992)). Defendants do not dispute that Booker's shoulder injury constitutes an objectively serious medical condition.

As for the subjective inquiry, a defendant acts with deliberate indifference "when he knows of a substantial risk of harm to an inmate and either acts or fails to act in disregard of that risk." *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011). Deliberate indifference is "more than negligence and approaches intentional

12

wrongdoing." *Id.* (quoting *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 988 (7th Cir. 1998)). Disagreement with a medical professional's recommended course of treatment does not constitute deliberate indifference. *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007). "To infer deliberate indifference on the basis of a prison physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006).

Delaying treatment may rise to the level of deliberate indifference if the delay "exacerbated the injury or unnecessarily prolonged an inmate's pain." *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010). Even a delay of a few days can constitute deliberate indifference when the condition is both severely painful and readily treatable. *Smith v. Knox Cnty. Jail*, 666 F.3d 1037, 1040 (7th Cir. 2012). In cases involving delay of medical assistance, plaintiffs must offer verifying medical evidence that the delay, not the underlying condition, caused the harm. *Williams v. Leifer*, 491 F.3d 710, 714–15 (7th Cir. 2007).

The individual defendants argue that there is no evidence from which a reasonable juror could find that they failed to comply with the professional standards of care, let alone that their treatment was so far afield from professional standards as to raise an inference that their decisions were not based on medical judgment. I agree. Viewing the facts in Booker's favor, he has failed to establish that any of the defendants provided medical care so deficient as to be actionable under § 1983. Aside from arguing that based on a generally recognized principle in the orthopedic-

medicine field—a claim for which Booker offers no citation or support, *see* [73] at 5–6—defendants should have altered their treatment of Booker after one year, there is no evidence that any of the defendants failed to meet professional medical standards. Moreover, the record reveals that defendants did alter the course of their treatment throughout the time they treated Booker. Though Booker had to wait nearly three years from the date of his injury to have an MRI taken of his shoulder, the medical professionals used a conservative but progressive course of treatment throughout that time. None of the X-rays taken at any point revealed abnormalities. Defendants and the other individuals who treated Booker over the years first prescribed pain medicine and advised Booker not to engage in activities that could exacerbate his injury. When that proved insufficient, defendants tried prescribing different pain medications, taking Booker's preferences into account. Dr. Obaisi administered three steroid injections, which at least initially appeared to be effective, and recommended physical therapy. Defendants did not merely continue with the same ineffective treatment.

Nor is this an example of denying relief for a readily treatable condition. Post-MRI, the recommended treatment for Booker's shoulder remained unchanged. Dr. Szuch, the orthopedic specialist, recommended physical therapy—not surgery, noting skepticism that even surgery could give Booker a pain-free shoulder. Booker did receive stronger pain medicine after he was diagnosed with a Hills-Sachs lesion, which may have allowed him to more actively participate in his physical therapy, but that does not mean defendants' decision not to prescribe narcotic-strength medication

14

until that time constitutes deliberate indifference. Indeed, even after determining that Booker had a Hills-Sachs lesion, Dr. Szuch did not recommend increasing his pain medication. And there is no other evidence that the refusal to provide Booker with stronger medicine was not based on sound medical judgment.

Because no reasonable juror could find that Booker was treated with deliberate indifference to his medical needs, there was no constitutional violation for which to hold Wexford responsible. And even if there were an underlying violation, there is no indication that Wexford's policy of viewing an inmate's medical complaints with healthy skepticism was the moving force behind it. *See Estate of Sims v. Cnty. of Bureau,* 506 F.3d 509, 514 (7th Cir. 2007). There is no evidence that any of the defendants suspected Booker was overstating his symptoms, or that their treatment decisions were motivated by skepticism. Though one of Booker's previous doctors noted this as a concern—as did the physical therapist—nothing suggests that those suspicions caused defendants to put aside their own professional judgment and act instead on someone else's suspicions. Nor is there anything to indicate that skepticism about a patient's unverified complaints of pain is a significant deviation from the standard of care.

No reasonable juror could conclude that defendants' treatment of Booker was based on anything other than the individual defendants' sound medical judgment, and so defendants' motion for summary judgment is granted.[8]

---

[8] Though Booker is not entitled to any damages because he has failed to demonstrate defendants' liability, I also note that Booker failed to respond to defendants' argument that

## IV. Conclusion

Defendants' motion for summary judgment [62] is granted. Enter judgment and terminate civil case.

ENTER:

---------------------------------------

Manish S. Shah
United States District Judge

Date: February 15, 2019

---

punitive damages are unwarranted, thereby waiving any argument to the contrary. *See Alioto v. Town of Lisbon*, 651 F.3d 715, 719 n. 1 (7th Cir. 2011).